FILED
United States Court of Appeals
Tenth Circuit

October 29, 2018

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

STEVEN WILLIAM DELIA,

    Defendant - Appellant.

No. 17-7051

_____

**Appeal from the United States District Court
for the Eastern District of Oklahoma
(D.C. No. 6:16-CR-00042-JHP-1)**
_____

Robert L. Wyatt of Wyatt Law Office, Oklahoma City, Oklahoma, for Defendant-Appellant.

Linda Epperley, Assistant United States Attorney (Brian Kuester, United States Attorney, and Melody Noble Nelson, Assistant United States Attorney, with her on the brief), Muskogee, Oklahoma, for Plaintiff-Appellee.
_____

Before **PHILLIPS**, **EBEL**, and **MORITZ**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.
_____

A federal grand jury indicted Steven DeLia on one count of healthcare fraud. *See* 18 U.S.C. § 1347. But the government filed the indictment outside the ordinarily applicable statute of limitations—that is, more than five years after DeLia's charged

conduct occurred. *See* 18 U.S.C. § 3282(a). Even so, for two independent reasons, the government argues that the indictment was timely: (1) that the Wartime Suspension of Limitations Act suspended the limitations period from running in this case, *see* 18 U.S.C. § 3287; and (2) that DeLia waived his asserted statute-of-limitations defense. We reject both reasons and conclude that the prosecution is time-barred. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse and remand with instructions to vacate DeLia's conviction and dismiss the indictment.

## BACKGROUND

In 2009, DeLia, then a licensed physician, opened a medical clinic in Sallisaw, Oklahoma, practicing family medicine and psychiatry. He also served as a member of the United States Army Reserve. In mid-2010, DeLia learned that the Army would deploy him to Afghanistan, so he began preparing the clinic for his absence.

At that time, DeLia's staff included two licensed practical nurses, LeeAnn Dewberry and Jennifer Campney, and one physician's assistant, Susan Davis (PA Davis). Under Oklahoma law, licensed practical nurses cannot prescribe Schedule II controlled substances. *See* Okla. Stat. tit. 59 § 567.4a; Okla. Stat. tit. 63 § 2-312(C). But Oklahoma law permits physician's assistants to prescribe Schedule II controlled substances[1] if acting under a physician's supervision and if the controlled substance is administered onsite. Okla. Stat. tit. 59 § 519.6(D).

---

[1] Under Oklahoma law, "Schedule II includes substances with the following characteristics: 1. High potential for abuse; 2. Currently accepted medical use in the United States, or currently accepted medical use with severe restrictions; and 3. The abuse of the substance may lead to severe psychic or physical dependence." Okla. Stat. tit. 63 § 2-205.

2

To keep his clinic open while he was deployed, DeLia signed pads of blank prescription forms for the clinic staff's use. This enabled the clinic staff to write prescriptions by simply completing the prescription forms with the patient's name, the drug, and the dosage. In total, DeLia signed about 5,000 blank prescriptions to prepare the clinic for his four-month deployment. PA Davis used the signed prescription forms to write prescriptions for Schedule II controlled substances. Among those receiving her prescriptions for Schedule II controlled substances were DeLia's pain-management patients, a group making up a significant portion of DeLia's practice. Though DeLia looked for a physician to supervise PA Davis during his deployment, he failed to obtain one.

In mid-October 2010, DeLia left Sallisaw to visit family before reporting to Fort Benning at month's end. Appellant's App. vol. 3 at 632:5–9. In early November, the Army sent DeLia from Fort Benning to Kuwait and then to Afghanistan.

About two weeks after Delia left Sallisaw, the Oklahoma Board of Medical Licensure (the Board) learned from an anonymous caller that DeLia was out of state and that his office staff was prescribing controlled substances with DeLia's pre-signed, blank prescription forms. In addition, the Oklahoma State Pharmacy Board received calls from pharmacists reporting that they had received new prescriptions for Schedule II controlled substances from DeLia, who they believed was not in Oklahoma.

Two Board investigators traveled to DeLia's clinic where they questioned the clinic staff. According to the Board's records, DeLia was PA Davis's sole supervising physician. PA Davis confirmed this to investigators. While at the clinic, investigators

3

confiscated 5,625 blank pre-signed prescriptions and a sign-out log showing that the clinic's staff had already used 4,330 pre-signed prescriptions between March 1, 2010 and November 3, 2010. Even before the Army told DeLia that it would deploy him in October, DeLia had pre-signed blank prescriptions for use when he was out of the clinic, including while he was vacationing. DeLia had also previously allowed clinic staff to use pre-signed, blank prescription forms to prescribe controlled substances even when he was working in the clinic—to increase office efficiency.

In February 2011, DeLia returned to Sallisaw. In December 2011, the Board filed a disciplinary action against DeLia, alleging that he had engaged in unprofessional conduct by pre-signing prescription forms for his staff to use while he was gone and by directing PA Davis to provide healthcare services despite his failure to secure for her a supervising physician. Okla. Stat. tit. 59 § 519.6(A). In March 2012, DeLia surrendered his medical license in lieu of prosecution by the Board.

In January 2016, DeLia met with federal prosecutors and signed a waiver of the applicable statute of limitations for "offenses, including but not limited to, conspiracy to commit health care fraud, health care fraud and money laundering." Appellant's App. vol. 1 at 34–36. In the waiver, DeLia acknowledged knowing that he was a target of a federal grand-jury investigation related to "his conduct causing false claims to be filed and for receiving health care payments from Medicare, Medicaid, and Tricare for services not provided from 2010 through 2011." Appellant's App. vol. 1 at 34 ¶ 1. The waiver further stated that DeLia desired to "extend" the applicable statute of limitations. *Id.* at 34 ¶ 2. Specifically, the waiver stated that DeLia had been "advised that if, in fact, the

4

statute of limitations as to any of the specified offenses were to expire during the period agreed upon," the waiver "would extend the period during which he could be prosecuted for such criminal violations." *Id.* at 35 ¶ 3. DeLia agreed to waive the statute of limitations "for the period from the date of his execution of this Waiver [January 5, 2016] through and including July 31, 2016." *Id.* at 36 ¶ 8.

On June 15, 2016, a federal grand jury indicted DeLia on one count of healthcare fraud, *see* 18 U.S.C. § 1347.[2] The indictment alleged that "[b]eginning February 1, 2010, and continuing through November 9, 2010" DeLia had "devised and executed a scheme to defraud the Oklahoma Medicaid program by causing the filing of false claims and receiving Medicaid payments for medical services not rendered by a qualified medical professional." *Id.* at 15–16. Three months before trial, DeLia moved to dismiss the indictment, arguing that the statute of limitations had expired. The district court denied DeLia's motion, concluding that the indictment was timely because the Suspension Act had tolled the statute of limitations. The case proceeded to trial.

After the government presented its case, DeLia moved for the district court to reconsider his motion to dismiss based on the statute of limitations. The district court denied DeLia's motion. The jury convicted DeLia of healthcare fraud. DeLia appealed the district court's denial of his motion to dismiss and his conviction.[3]

---

[2] The indictment also included a forfeiture allegation for any proceeds obtained from the charged offense.

[3] Because we conclude that the prosecution is time-barred, we don't decide the other issues DeLia raises on appeal—whether the district court violated his Sixth

5

**DISCUSSION**

On appeal, DeLia argues that the district court erred in ruling that the statute of limitations hadn't expired. First, DeLia argues that the Suspension Act applies to war-related frauds against the federal government, not to healthcare fraud against a state agency. Second, he argues that the government cannot use a waiver to revive an already-expired limitations period. Third, DeLia argues that even if a waiver could revive an already-expired limitations period, the waiver would be unenforceable because he didn't knowingly execute it, meaning he didn't know when he signed the waiver that the statute of limitations had already expired for what would ultimately be the charged conduct.[4] We address each of these arguments after identifying our standard of review and discussing the applicable criminal statute of limitations.

## I. Standard of Review

We review de novo a district court's interpretation and application of a statute of limitations. *Barnes v. United States*, 776 F.3d 1134, 1139 (10th Cir. 2015). And we review de novo the question of whether a defendant's express waiver of the statute of limitations is enforceable. *United States v. Flood*, 635 F.3d 1255, 1258 (10th Cir. 2011).

---

Amendment right to self-representation and whether the government presented sufficient evidence to sustain his conviction.

[4] The government charged DeLia for his acts from February 1, 2010 through November 9, 2010. The waiver declares that DeLia knows he is a target of a grand jury investigation for making false claims and taking unearned healthcare payments "from 2010 through 2011." If the government had charged DeLia for acts committed between January 5, 2011 (five years before the waiver) and July 31, 2011 (five years before the waiver's agreed end date), the indictment would have been timely for that conduct. In other words, the waiver here added roughly seven months to the applicable statute of limitations.

6

**II. The Statute of Limitations**

The government had five years from DeLia's alleged criminal conduct to indict him. *See* 18 U.S.C. § 3282(a).[5] A "statute of limitations reflects a legislative judgment that, after a certain time, no quantum of evidence is sufficient to convict." *Stogner v. California*, 539 U.S. 607, 615 (2003). This time limit "is designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past." *Toussie v. United States*, 397 U.S. 112, 114–15 (1970). Statutes of limitations also encourage law enforcement to promptly investigate suspected criminal activity. *Id.* at 115.

A statute of limitations "provides a nonjurisdictional defense, not a jurisdictional limit." *Musacchio v. United States*, 136 S. Ct. 709, 718 (2016). So a defendant must affirmatively and timely raise a statute-of-limitations defense. *Id.* at 717–18. When a defendant does so, "the Government *then* bears the burden of establishing compliance with the statute of limitations by presenting evidence that the crime was committed within the limitations period or by establishing an exception to the limitations period." *Id.* at 718.

Here, the indictment charged DeLia with criminal conduct occurring between February 1, 2010 through November 9, 2010. So absent an exception, the statute of

---

[5] The general statute of limitations for non-capital criminal offenses provides that "[e]xcept as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed." 18 U.S.C. § 3282(a).

limitations would have expired on November 9, 2015. But the government didn't file the indictment until June 15, 2016. To excuse its delay, the government argues two independent positions: (1) that the Suspension Act tolled the statute of limitations, and (2) that, even if the statute of limitations did expire, DeLia waived his statute-of-limitations defense.[6]

## A. Wartime Suspension of Limitations Act

"When the United States is at war or Congress has enacted a specific authorization for the use of the Armed Forces," the Suspension Act suspends the statute of limitations for certain offenses "until 5 years after the termination of hostilities." 18 U.S.C. § 3287. Congress enacted the Suspension Act to guard against the increased potential of fraud against the federal government during wartime by giving the government more time to discover and prosecute such offenses. *See Kellogg Brown & Root Servs., Inc. v. United States, ex rel. Carter*, 135 S. Ct. 1970, 1973, 1975 (2015); *Bridges v. United States*, 346 U.S. 209, 218 (1953). The Suspension Act "creates an exception to a longstanding congressional 'policy of repose' that is fundamental to our society and our criminal law." *Bridges*, 346 U.S. at 215–16. So the statute "should be 'narrowly construed,'" and any ambiguity should be "'interpreted in favor of repose.'" *Kellogg*, 135 S. Ct. at 1978 (quoting *Bridges*, 346 U.S. at 216).

In September 2001, Congress specifically authorized the use of military force "against those responsible for the [September 11, 2001] attacks launched against the

---

[6] The waiver of the statute of limitations that DeLia executed doesn't reference the Suspension Act.

8

United States." Authorization for the Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001). And in October 2002, Congress specifically authorized the use of military force in Iraq. Authorization for Use of Military Force Against Iraq Resolution of 2002, Pub. L. No. 107–243, 116 Stat. 1498. Hostilities end within the meaning of the Suspension Act only when "proclaimed by a Presidential proclamation, with notice to Congress, or by a concurrent resolution of Congress." 18 U.S.C. § 3287.

DeLia acknowledges that the Suspension Act tolls the statute of limitations for some criminal offenses and that, for those offenses, the tolling continues until the President or Congress proclaims the termination of hostilities. But DeLia disputes that the Suspension Act applies to his charged offense—defrauding a state healthcare benefit program. The Suspension Act applies to any offense:

> (1) involving fraud or attempted fraud against the United States or any agency thereof in any manner, whether by conspiracy or not, or (2) committed in connection with the acquisition, care, handling, custody, control or disposition of any real or personal property of the United States, or (3) committed in connection with the negotiation, procurement, award, performance, payment for, interim financing, cancelation, or other termination or settlement, of any contract, subcontract, or purchase order which is connected with or related to the prosecution of the war or directly connected with or related to the authorized use of the Armed Forces, or with any disposition of termination inventory by any war contractor or Government agency.

18 U.S.C. § 3287.

Offenses involving fraud covered by the Suspension Act are "limited strictly to offenses in which defrauding or attempting to defraud the United States is an

9

essential ingredient of the offense charged." *Bridges*, 346 U.S. at 221.[7] In *Bridges*, the Court held that the Suspension Act didn't apply to offenses charging knowingly making a false statement under oath in naturalization proceedings, because the offenses didn't "involve the defrauding of the United States in any pecuniary manner or in a manner concerning property." *Id.*

By contrast, in *United States v. Grainger*, 346 U.S. 235, 237, 241–45 (1953), the Court held that the Suspension Act did apply to false claims for wool purchases from a federal agency (the Commodity Credit Corporation), because defrauding the federal government was "an essential ingredient of the offenses charged."

To determine whether the Suspension Act applies, we must evaluate the elements of the charged offense. *Bridges*, 346 U.S. at 222–23. Here, DeLia was charged with

---

[7] The government argues that the current Suspension Act is "very different" from the version the Supreme Court interpreted in *Bridges*. Appellee's Response Br. at 37. Previous versions of the Suspension Act applied to only fraud against the federal government or any agency thereof. *See* Act of Aug. 24, 1942, ch. 555, 56 Stat. 747–48. In 1944, Congress amended the Suspension Act to include offenses committed in connection with war-related government contracts, § 19(b), 58 Stat. 667 (1944), and offenses committed in connection with surplus property, § 28, 58 Stat. 781 (1944). Again, in 1948, Congress amended the Suspension Act to apply to offenses: (1) involving fraud against the federal government or an agency thereof; (2) committed in connection with the federal government's property; or (3) committed in connection with war-related government contracts. § 3287, 62 Stat. 828 (1948). Finally, in 2008, Congress amended the Suspension Act to suspend statutes of limitations not only when the "United States is at war" but also when "Congress has enacted a specific authorization for the use of the Armed Forces." § 855, 122 Stat. 4545 (2008). Congress also lengthened the suspension period from three to five years after hostilities end. *Id.* And Congress required notice of any Presidential proclamation terminating hostilities. *Id.* So the differences between the current Suspension Act and the version of the statute at issue in *Bridges* don't impact our interpretation of what constitutes fraud against the federal government under the statute.

healthcare fraud under 18 U.S.C. § 1347, which makes it unlawful to "defraud any health care benefit program . . . in connection with the delivery of or payment for health care benefits, items, or services." A "health care benefit program" is "any public or private plan or contract . . . under which any medical benefit, item, or service is provided to any individual." 18 U.S.C. § 24(b).

DeLia argues that the Suspension Act doesn't apply to § 1347, because Congress enacted the Suspension Act to combat war-related fraud. And, he says, the charged offense involves not war-related fraud against the federal government, but healthcare fraud against a state agency.

The government responds that the Suspension Act applies because Medicaid is a federal-state partnership that involves a substantial expenditure of federal funds.[8] From there, the government argues that the charged offense fits into two of the three offense categories covered by the Suspension Act—first, offenses involving fraud against the federal government; and second, offenses committed in connection with the federal government's property (here, federal funds). We conclude that the government has failed to establish that the Suspension Act applies to the charged offense.

---

[8] Though the government's arguments reference Medicaid fraud, the government charged DeLia with healthcare fraud under 18 U.S.C. § 1347. A separate criminal statute addresses fraud against a federal healthcare program. *See* 42 U.S.C. § 1320a-7b.

Though the government argues that Medicaid fraud[9] constitutes fraud against the United States or a federal agency, the charged offense—healthcare fraud—contains no element requiring proof that DeLia defrauded the federal government. Instead, § 1347 requires proof that DeLia defrauded a "health care benefit program." The district court instructed the jury that the government had to prove four elements beyond a reasonable doubt:

> *First*: the defendant devised a scheme or artifice to defraud a health care benefit program in connection with the delivery of or payment for health care benefits, items or services;
> *Second*: the defendant executed or attempted to execute this scheme or artifice to defraud;
> *Third*: the defendant acted knowingly and willfully with the intent to defraud; and

---

[9] The district court cited one case in which a court applied the Suspension Act to an offense involving Medicaid fraud. *United States v. Delia*, No. 16-CR-42-JHP, 2016 WL 4385999, at *3 (Aug. 17, 2016) (citing *United States v. Planned Parenthood Gulf Coast, Inc.*, 21 F. Supp. 3d 825, 827–28, 837 (S.D. Tex. 2014) (applying the Suspension Act to a False Claims Act claim alleging that the defendant had fraudulently billed Medicaid for blood tests)). In addition, we found two cases applying the Suspension Act to offenses involving Medicaid fraud. *See United States v. Saber Health Care Grp.*, No. 1:13 CV 197, 2015 WL 12766495, at *1, 5 (N.D. Ohio Mar. 12, 2015) (applying the Suspension Act to a False Claims Act claim alleging that the defendant submitted fraudulent claims to Medicaid for patients admitted for thirty-day bed holds); *United States ex rel. Paulos v. Stryker Corp.*, No. 11-0041-CV-W-ODS, 2013 WL 2666346, at *1, 15 (W.D. Mo. June 12, 2013) (applying the Suspension Act to a False Claims Act claim alleging that the defendant marketed its pain pumps for uses that the FDA declined to approve then sought reimbursement for those unapproved uses from Medicaid and other programs), *aff'd on other grounds*, 762 F.3d 688 (8th Cir. 2014). But each of these cases involved civil False Claims Act violations. The False Claims Act imposes liability on anyone who knowingly defrauds the federal government. *See* 32 U.S.C. § 3729. By contrast, the healthcare fraud statute the government charged DeLia under makes it unlawful to defraud a "health care benefit program." 18 U.S.C. § 1347. Further, the Supreme Court has since held that the Suspension Act applies to only criminal offenses, and doesn't extend to civil False Claims Act claims. *Kellogg*, 135 S. Ct. at 1978.

> *Fourth*: the scheme to defraud employed false or fraudulent pretenses, representations, or promises.

Appellant's App. vol. 1 at 135. Nothing required the jury to find that DeLia had defrauded the federal government or a federal agency. In fact, the indictment alleged that DeLia had executed a scheme "to defraud money and property owned by and under the custody and control of the Oklahoma Health Care Authority, a health benefit program." Appellant's App. vol. 1 at 16.

At trial, the government presented evidence that the healthcare benefit program DeLia defrauded was the Oklahoma Health Care Authority ("the Authority"). This evidence included testimony from the Authority's employees and DeLia's former office staff. One Authority employee, Amy Bradt, testified about the provider agreement that DeLia and the Authority had signed, which required DeLia to provide medical services in accordance with his license and to comply with the rules and regulations of the Authority. Another Authority employee, Jean Krieske, testified about the supervision requirements for physician's assistants and their prescriptive authority, particularly the limited circumstances in which they can prescribe Schedule II controlled substances.

PA Davis, who had served as DeLia's physician's assistant during the time period alleged in the indictment, testified about using the pre-signed prescription forms to prescribe Schedule II controlled substances that she knew she couldn't lawfully prescribe. PA Davis also testified that she had no supervising physician while DeLia was deployed. Finally, Justin Etchieson, a data analyst at the Oklahoma

13

Attorney General's Office Medicaid Fraud Control Unit, testified about the claims that the Authority had paid for services provided at DeLia's clinic and for Schedule II prescriptions.

The government also presented evidence that the Authority is a state agency. Bradt testified that the Authority is "the state Medicaid agency," meaning it is the "one state agency that processes and pays Medicaid claims[.]" Appellant's App. vol. 1 at 204:17–22. And Etchieson testified that the Authority is "the state agency that administers the Medicaid program." Appellant's App. vol. 2 at 548:12–15. So the charged offense involved fraud against a state agency, not the federal government or a federal agency.[10]

Faced with this fact, the government argues that the Suspension Act applies because the federal government partly funds Oklahoma's Medicaid program. We have already concluded that the charged offense doesn't have as an element fraud against the federal government, so we next analyze the government's argument in the context of the second category of offenses, those committed in connection with the federal government's property. *See* 18 U.S.C. § 3287.

---

[10] The government argues that if we accept DeLia's argument that the offense involves fraud against a state agency, not the federal government or federal agency, "no federal program which partners with or passes through a state source would qualify as a fraud victim under the WSLA (perhaps even those federally & state funded programs directly related to the military)." Appellee's Response Br. at 35. We disagree. The government's delay in charging caused its present difficulties. If the government wishes to take advantage of the extra time afforded to it by the Suspension Act, it should ensure that its charged offense requires proof that the fraud was against the federal government. Further any military- or war-related offenses could also fit under the Suspension Act's third category, offenses committed in connections with war-related government contracts. *See* 18 U.S.C. § 3287.

At trial, Bradt testified that the Authority uses federal and state funds to satisfy claims. But the government wasn't required to prove that the funds the federal government distributes to the Authority continue to belong to the federal government. Instead, the indictment alleged that the offense involved money and property owned by the Authority. At trial, the government presented evidence that the offense involved claims submitted to and paid by the Authority.

Though the Authority receives federal funds, that fact alone is insufficient to bring the charged offense within the scope of the Suspension Act. The charged offense must be committed in connection with the federal government's property, *see* 18 U.S.C. § 3287, a fact that the government wasn't required to prove for the jury to find DeLia guilty of the charged offense. And the government cites no authority for the proposition that defrauding a program partially funded by federal money qualifies as an offense committed in connection with the federal government's property. Accepting the government's argument would require us to expand the scope of the Suspension Act beyond any court's previous constructions of the statute.[11]

---

[11] The Supreme Court's most recent decision addressing the Suspension Act held that the statute is limited to criminal offenses. *Kellogg*, 135 S. Ct. at 1978. And the decision reaffirmed that courts must narrowly construe the statute. *Id.* We have located few circuit-court decisions applying the Suspension Act to toll the limitation periods for charged offenses, and none tolling the five-year limitation period in which to indict charges under § 1347. *See United States v. Melendez-Gonzalez*, 892 F.3d 9, 12, 15 (1st Cir. 2018) (applying the Suspension Act to charges involving fraudulent recruitment practices for the National Guard); *United States v. Frediani*, 790 F.3d 1196, 1198, 1200–01 (11th Cir. 2015) (applying the Suspension Act to charges involving bids for contracts with the Department of Defense related to military aircrafts); *United States v. Loman*, 597 F. App'x 518, 519, 522–23 (10th Cir. 2015) (applying the Suspension Act to charges involving a kickback scheme at an Air Force base); *United States v. Pfluger*, 685 F.3d

We conclude that the Suspension Act does not apply to the charged offense. Interpreting the Suspension Act to extend beyond offenses against the federal government and its agencies would be inconsistent with the narrow construction we must give the statute and wouldn't serve the statute's purpose—providing the federal government with additional time to discover and prosecute offenses against it during wartime.

## B. Waiver

We have previously held "that defendants can expressly waive the bar to prosecution established by the statute of limitations." *United States v. Flood*, 635 F.3d 1255, 1258 (10th Cir. 2011). For a waiver to be enforceable, the defendant must knowingly and voluntarily execute the waiver. *See id.* at 1259. DeLia argues that his waiver of the statute of limitations is unenforceable because he didn't know that the statute of limitations governing the charged conduct had already expired before he signed the waiver.

After examining the waiver's language, we conclude that DeLia didn't waive his right to enforce the expired portion of the statute of limitations applying to his charges. So we agree with DeLia that he did not knowingly waive his right to assert the statute of

481, 482, 485 (5th Cir. 2012) (applying the Suspension Act to charges involving frauds committed in connection with war-related government contracts); *United States v. Lurie*, 222 F.2d 11, 13, 15 (7th Cir. 1955) (applying the Suspension Act to charges involving fraud against the federal government related to the sale of surplus property); *United States v. Witherspoon*, 211 F.2d 858, 859, 863 (6th Cir. 1954) (same); *United States v. Gottfried*, 165 F.2d 360, 362, 368 (2d Cir. 1948) (applying the Suspension Act to charges involving making a false statement to the Office of Price Administration and conspiracy to defraud the federal government related to the purchase of sugar).

limitations, but we do so for a reason one step back in the analysis—we hold that by the waiver's own terms DeLia did not waive, knowingly or unknowingly, the statute of limitations for the charges the government elected to pursue.

When determining the scope of a waiver, we "must strictly construe any ambiguities in the agreement against the government (the drafter) and in favor of the defendant." *United States v. Gordon*, 480 F.3d 1205, 1207 (10th Cir. 2007). "This means waivers should be narrowly construed." *Id.* Narrow construction of a waiver of the statute-of-limitations defense is also appropriate because criminal statutes of limitations are "to be liberally interpreted in favor of repose." *United States v. Reitmeyer*, 356 F.3d 1313, 1317 (10th Cir. 2004) (quoting *United States v. Marion*, 404 U.S. 307, 322 n.14 (1971)).

Here, the waiver purports to extend the limitations period, not to revive an already expired limitations period. The waiver states that DeLia "understands that absent such a waiver the United States would be prohibited from prosecuting him for violations of certain criminal offenses . . . after a period of five years has elapsed from the last date of the violations." Appellant's App. vol. 1 at 35 ¶ 3. The waiver next states that DeLia had been "advised that if, in fact, the statute of limitations as to any of the specified offenses were to expire during the period agreed upon in this document, this Waiver would *extend* the period during which he could be prosecuted." *Id.* (emphasis added). The language "after a period of five years has elapsed" and "were to expire" indicates that the statute of limitations had not yet expired. Likewise, DeLia agreed to waive the statute of limitations for a specified period—"from the date of his execution of this Waiver [January 5, 2016]

17

through and including July 31, 2016." *Id.* at 36 ¶ 8. Along the same line, the waiver speaks of DeLia's tolling "the applicable statute of limitations effective as of the date of his execution of this waiver [January 5, 2016], through and including July 31, 2016." *Id.* at 35 ¶ 3. This time period further suggests that the waiver excludes any statute of limitations that had already expired when DeLia executed the waiver. Especially when we narrowly construe the waiver against the government, we conclude that this language defeats any government argument that this waiver in fact revived an already-expired limitations period.

For the charged crime, the statute of limitations expired before DeLia signed the waiver. Accordingly, the time period charged in the indictment did not fall within the scope of the agreed extension—January 5, 2011 until July 31, 2011. So the statute of limitations expired on November 9, 2015. That being so, we hold that DeLia has a right to assert his winning statute-of-limitations defense.

## CONCLUSION

For the foregoing reasons, we reverse the district court's denial of DeLia's motion to dismiss and remand with instructions to vacate DeLia's conviction and dismiss the indictment.

18